**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| [1] MARTHA DONELSON              )<br>                                                         )<br>          **Plaintiff,**               )<br>                                                         )<br>vs.                                                    )<br>                                                         )<br>[2] DEVON ENERGY PRODUCTION )<br>COMPANY, L.P., and [3] UNITED STATES )<br>OF AMERICA; DEPARTMENT OF   )<br>INTERIOR;  BUREAU OF INDIAN AFFAIRS  )<br>                                                         )<br>          **Defendants.**            ) | Case No.  14-CV-316-JHP-TLW |

**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT**

Plaintiff, Martha Donelson ("Donelson"), by and through her attorneys, Drummond Law. PLLC, pursuant to Fed.R.Civ.Pro. 65, respectfully requests that this Court grant a Temporary Restraining Order and Preliminary Injunction against Devon Energy Production Co., LP ("Devon"), prohibiting Devon from commencing drilling operations upon Donelson's property until the Bureau of Indian Affairs fully complies with the relevant environmental regulations and Devon is issued a valid drilling permit.  In support of her Motion, Donleson shows the Court the following:

**BASIS FOR PRELIMINARY INJUNCTION**

Devon obtained drilling permits for horizontal wells on Donelson's property pursuant to certain oil and gas mining leases approved by the Bureau of Indian Affairs ("BIA"), by and through the Osage Agency Superintendent. However, the oil and gas mining leases and drilling permits obtained by Devon covering Donelson's property are void *ab initio* because the BIA failed to comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, prior to approval of the leases and permits. Consequently, Devon has no right to

access or to drill on Donelson's property. Due to the legally unique nature of real property, Donelson will suffer irreparable harm if Devon is permitted to drill  Accordingly, Donelson is entitled to a Preliminary Injunction to enjoin Devon from commencing drilling operations until the BIA fully complies with the relevant environmental regulations and Devon is issued a valid drilling permit.

## REQUEST FOR TEMPORARY RESTRAINING ORDER

Donelson seeks a Temporary Restraining Order to keep the status quo until this Court can hold a hearing on Donelson's request for Preliminary Injunction.  Devon is represented by Chuck Greenough of McAfee & Taft, and counsel for Donelson has advised Mr. Greenough of this filing.  Mr. Greenough has advised that he is authorized to accept service on behalf of Devon.

## BACKGROUND

In 1906, Congress passed the Osage Allotment Act ("Act"), 34 Stat. 539, in part for the purpose of dividing the land in the Osage Reservation among the members of the Osage Tribe. The Act established a subsurface mineral estate trust, held by the United States, on behalf of the Osage Tribe.   The Secretary of the Interior is directed to manage oil and gas extraction leases, with the royalties earned from the leases reserved to the Osage Tribe.

In 1929, the Act was amended, establishing a mandatory administrative procedure for surface owners or lessees of Osage Reservation lands in order to address claims under the Act for damages caused by oil or gas extraction on the Osage Reservation.   Federal regulations regarding the management and handling of oil and gas drilling in Osage County are promulgated in 25 CFR, Part 226.

Under the authority delegated by 25 CFR 226.2, 209 DM 8, 230 DM 1, 3 IAM 4.1 and the Muskogee Area Addendum 9901 to 3 IAM 4 issued June 22, 1999, the Superintendent for the

Osage Agency is authorized to approve leases for oil and gas drilling within Osage County. 25 CFR § 226.2(c) provides that "[e]ach oil and/or gas lease and activities and installations associated therewith subject to these regulations shall be assessed and evaluated for its environmental impact *prior* to its approval by the Superintendent." (emphasis added.)

## NEPA REQUIREMENTS

Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA requires "all agencies of the Federal government" to prepare an EIS before authorizing any "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The approval of leases and permits on Indian lands constitutes "major federal action" and is subject to NEPA. See *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972). The approval by the BIA of leases and/or drilling permits without compliance with NEPA renders the leases and permits void *ab initio*. *Sangre de Cristo Development, Inc. v. U.S.*, 932 F.2d 891 (10th Cir. 1991); *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972); *Gray v. Johnson*, 395 F.2d 533, 537 (10th Cir. 1968); *Louise Scott v. Acting Albuquerque Area Director*, 29 IBIA 61, 1996 WL 69335 (February 7, 1996).

NEPA requires all federal agencies, including the BIA, to take a "hard look" at the environmental consequences of proposed federal actions. 42 U.S.C. § 4332(C)(i)-(ii). In doing so, an agency must identify and disclose to the public the impacts of a proposed action on the environment. 40 C.F.R. § 1502.1. If an action "may" have a significant impact on the environment, NEPA requires the agency to prepare an environmental impact statement ("EIS"). 40 C.F.R. § 1508.18; 42 U.S.C.§ 4332(C). Where the impacts of a project are not significant, or the agency is uncertain about their significance, it can prepare a shorter analysis called an

environmental assessment ("EA"). 40 C.F.R. §§ 1501.3, 1508.9. Part of NEPA's "hard look" mandate requires considering a project's impacts in context. An agency must analyze the "cumulative impact" to the environment "which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

## FACTS IN SUPPORT OF PRELIMINARY INJUNCTION

1. Martha Donelson is the owner of surface land in Osage County, Oklahoma, comprising approximately 2,000 acres located in Burbank, Oklahoma, in Osage County, including the SE/4 of Section 29, Township 26 North, Range 5 East (hereinafter referred to as the "Property"). See Affidavit of Martha Donelson, attached hereto as **Exhibit "A,"** ¶ 1.

2. On December 13, 2010, the Osage Minerals Council ("OMC"), as the elected governing body for the mineral affairs of the Osage Mineral Estate, entered into a Lease Acquisition & Exploration Agreement with Spyglass Energy Group, LLC ("Spyglass") for the South Bend Concession Area covering approximately 56,560 acres in Osage County. See Resolution attached hereto as **Exhibit "B."**

3. On June 25, 2012, the OMC and Spyglass entered into Oil & Gas Mining Lease 14-20-G06-22607 covering all of Section 29, Township 26, North, Range 5 East, in Osage County. See Lease attached hereto as **Exhibit "C."** On August 2, 2012, Rhonda Loftin, as Superintendent of the Osage Agency, approved Lease 14-20-G06-22607 without assessing or evaluating the environmental impact of the lease prior to approval as required by 25 CFR § 226.2(c). *Id*.

4. On June 25, 2012, the OMC and Spyglass entered into Oil & Gas Mining Lease 14-20-G06-22553 covering the East Half of Section 32, Township 26 North, Range 5 East, in Osage County, Oklahoma. See Lease attached hereto as **Exhibit "D."** On July 16, 2012, Charles Hurlburt, as Acting Superintendent of the Osage Agency, approved Lease 14-20-G06-22553 without assessing or evaluating the environmental impact of the lease prior to approval as required by 25 CFR § 226.2(c). *Id*.

5. On July 18, 2012, the OMC approved the assignment of the Leases comprising the South Bend Concession to Devon Energy. See Assignment attached hereto as **Exhibit "E."**

6. In September 2012, Melissa Currey, Superintendent of the Osage Agency, approved assignment of the Leases. See Assignment of Leases attached hereto as **Exhibit "F"** and "**G**."

7. Donelson inherited the Property from her grandfather in 1969, with her mother, Fannie Donelson ("Fannie"), retaining a life estate in the Property. Exh. A, ¶ 2. Fannie passed away on May 15, 2013. Exh. A, ¶ 3.

8. Since Fannie's passing, Donelson learned that Devon contacted Fannie regarding drilling horizontal wells on the Property. Exh. A, ¶ 4. According to a letter that Donelson obtained after Fannie's death, Devon advised that it intended to place a four well pad covering approximately five acres of the Property. Even though Donelson was the surface owner of the Property, Devon never contacted her until approximately the Fall of 2013. Exh. A, ¶ 4.

9. In December 2013, Donelson received a letter from the Osage Agency Superintendent informing her that there would be a meeting held on January 9, 2014, regarding the ingress and egress to the wells on her Property. Exh. A, ¶ 5.

10. On January 7, 2014, Richard Winlock of the BIA sent Donelson a certified letter advising that the meeting had been cancelled for "unforeseen circumstances." Exh. A, ¶ 6.

11. On March 13, 2014, the Acting Superintendent Mary King approved three separate drilling permits for wells identified as Donelson 29-26N-5E 1SWD, Donelson 29-16N-5E 1MH and Donelson 32-26N-5E 1 MH. See drilling permits attached hereto as **Exhibit "H," "I," and "J"**, respectively.

12. Upon learning that Devon may have been granted drilling permits, Donelson contacted the OMC to voice her concern regarding the environmental impact on the Property and her health and safety. Exh. A, ¶ 7

13. On or about April 29, 2014, Devon commenced or planned to commence oil and gas drilling on the Property to which Ms. Donelson objected and sought a meeting with the BIA. Exh. A, ¶ 8.

14. On May 4, 2014, Donelson's daughter, Tasha Fox, and her fiancé, Fred Green, met with the BIA at the Osage Agency along with representatives from Devon. Donelson did not attend because she was too distraught over the process. She instructed her representatives to seek a cancellation of the drilling permits, or, in the alternative, to move the well at least 200 yards to the West. Exh. A, ¶ 9.

15. That same day, Devon filed a Petition against Donelson in Osage County District Court along with an Application for Temporary Restraining Order ("TRO") and Temporary Injunction asking the Court to enjoin Donelson from prohibiting Devon from commencing drilling operations. See Osage County docket sheet for Case No. CV-2014-33 attached hereto as **Exhibit "K."**

16. On May 14, 2014, Donelson, by and through counsel, submitted a Notice of Appeal of the issuance of the drilling permits to the Area Director. See correspondence attached hereto as **Exhibit "L."**

17. Also on May 14, 2014, Donelson submitted a notice pursuant to 25 CFR § 2.78 requesting that the Superintendent cancel or suspend the drilling permits based upon the lack of compliance with NEPA. See correspondence attached hereto as **Exhibit "M."**

18. On May 15, 2014, Donelson filed in Osage County District Court a Response to the Application for TRO and Temporary Injunction along with her own Motion for Temporary Injunction seeking to prohibit Devon from commencing drilling operation based upon the failure of the BIA to comply with NEPA prior to approving the drilling permits. Exh. K.

19. On March 16, 2014, the hearing on Devon and Donelson's respective motions was held before Judge B. David Gambill in Osage County District Court. At the conclusion of the hearing, Judge Gambill took the matter under advisement until May 23, 2014, which was then continued to May 28, 2014. Exh. K.

20. On May 28, 2014, Judge Gambill issued a written order entering a TRO enjoining Devon from commencing drilling operations and further enjoining Donelson from prohibiting Devon from performing surveys or other evidence gathering activities. Judge Gambill ruled that the TRO for each party would remain in effect for fourteen (14) days in order to provide the parties an opportunity to remove the matter to federal court. See Order attached hereto as **Exhibit "N."**

21. Subsequent to the Judge Gambill's ruling, the BIA responded to counsel's FOIA request for all documents relating to Devon's application for drilling permits. See correspondence from BIA dated June 3, 2014, attached hereto as **Exhibit "O."** The only

7

environmental document produced was a 1979 Environmental Assessment regarding oil and gas leasing in Osage County. See Environmental Assessment attached hereto as **Exhibit "P."** This Environmental Assessment does not address horizontal drilling or hydraulic fracturing. Id. Moreover, this Environmental Assessment does not address any site specific issues concerning the proposed activity on Donelson's Property. *Id*.

22.     Donelson has brought this action in order to: (1)  obtain a ruling that the Leases and drilling permits are void *ab initio,* (2) require the BIA to take whatever steps necessary to remove Devon from the Property; (3) obtain a judgment in her favor and against Devon on her trespass claim; and (4) enjoin Devon from further entering upon the Property without a valid Lease or commencing drilling operations without a valid drilling permit. See Complaint, ¶ 44.

## ARGUMENT AND AUTHORITIES

### I.     A PRELIMINARY INJUNCTION SHOULD BE GRANTED TO DONELSON

A preliminary injunction is appropriate when: (1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits, and (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party, and (4) the injunction would not be contrary to the public interest. *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1254-55 (10th Cir. 2006).  As discussed below, each of these factors weighs in favor of injunction relief against Devon.

#### A.     Donelson Will Suffer Irreparable Harm If The Injunction Is Not Granted.

NEPA's purpose is to influence the decision making process "by focusing the [federal] agency's attention on the environmental consequences of a proposed project," so as to "ensure[ ] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens*

*Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir.1989). This harm is considered harm to the environment because "the 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the action federal agency." *Catron Cty. Bd. of Commissioners v. United States Fish & Wildlife Serv.,* 75 F.3d 1429, 1433 (10th Cir.1996). The Tenth Circuit has held that harm to the environment is **presumed** when an agency fails to comply with NEPA. *Davis v. Mineta,* 302 F.3d 1104, 1115 (10th Cir.2002).

Because there has not been an EIS successfully completed concerning the leases and proposed wells, the scope of the environmental impact on the Property is unknown and thus potentially catastrophic. The proposed wells are horizontal wells covering over five (5) acres of the surface estate and are very near a water source on Donelson's Property. Therefore, there is significant danger that these wells could cause harm to the water sources on the Property, the air quality and the land in general. The damage to Donelson's Property will be irreparable and no amount of money damages will remedy the harm. Moreover, "[a]s a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfrense v. Village of Williams Bay,* 685 F.2d 877, 883 (7th Cir.1989)  Accordingly, Donelson will suffer irreparable harm if Devon is permitted to drill without compliance with NEPA.

### B.   Donelson Will Likely Prevail On The Merits

"To warrant issuance of preliminary injunction, it is not necessary that moving party's right to final decision be without doubt; rather, the burden is on party seeking relief to make

prima facie showing of reasonable probability of prevailing on the merits." *Williams Expl. Co. v. U.S. Dept. of Energy*, 561 F.Supp. 465 (N.D. Okla. 1980). A plaintiff may carry her burden by demonstrating likelihood of success, which is accomplished through demonstrating a "fair ground for litigation" of one or more of their claims. See *Heidman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003); *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1199 (10th Cir. 1992). Moreover, if the other three grounds for preliminary injunction "tip strongly" in favor of the plaintiff, this factor may be established by "showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1256 (10th Cir. 2003).

> **1.      BIA Must Comply With NEPA Prior To Approving Leases or Drilling Permits**

Under the Osage Allotment Act of 1906, the mineral estate underlying the Osage reservation in Osage County is held in trust by the U.S. government. *Bell v. Phillips Petroleum Co.*, 641 P.2d 115, 1117 (Okla. 1982). Under the regulations adopted by the Secretary of Interior, the Osage Tribal Council, with the approval of the Superintendent of the Osage Agency, has the authority to grant oil and gas mining leases. See 25 C.F.R. § 226.2. Prior to beginning drilling operations, a lessee must obtain a drilling permit from the Superintendent of the Osage Agency.

NEPA requires federal agencies to consider the environmental consequences of their actions and to allow public participation in the decision-making process. *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1162 (10th Cir.2002) (NEPA "require[s] agencies to consider environmentally significant aspects of a proposed action."). Towards those ends, NEPA requires federal agencies to prepare environmental impact statements ("EIS") for

"major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The approval of leases on federal lands or a drilling permit is a major federal action under NEPA. 40 CFR § 1508(b)(4); *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972).

### 2. The Devon Leases and Drilling Permits Were Approved In Violation Of NEPA

In response to a FOIA request for documents relating to the Devon drilling permits, the BIA produced a 1979 EA covering the entirety of Osage County. Exh. P. The thirty-five year old EA produced by the BIA is completely out of date and does not address horizontal drilling, hydraulic fracturing or any site-specific assessment of the potential environmental harm that could result from Devon's proposed drilling activities. *Id*. By failing to conduct an EIS prior to approving the leases or drilling permits, the BIA has failed its obligation to take a hard look at the environmental consequences of proposed federal actions. 42 U.S.C. § 4332(C)(i)-(ii), or to identify and disclose to the public the impacts of a proposed action on the environment. 40 C.F.R. § 1502.1. Accordingly, the leases and drilling permits were issued in violation of NEPA.

### 3. The Leases Are Void *Ab Initio*.

Devon's drilling permits and the leases are void *ab initio*. In *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972), the Tenth Circuit held that the Department of Interior was without authority to grant a lease where no environmental study pursuant to NEPA had been conducted prior to approval. *Id. at 594*. In *Sangre de Cristo Development, Inc. v. U.S.*, 932 F.2d 891 (10th Cir. 1991), the Tenth Circuit clarified the holding in *Davis* by holding that the initial approval of the lease in *Davis* was invalid because it was not preceded by the requisite environmental study. *Id*. at 894; see also *Gray v. Johnson*, 395 F.2d 533, 537 (10th Cir. 1968)("[a]ctions by the local agency contrary to the regulations and contrary to the best interest of the Indian do not create a vested interest in the lease.); see also *Louise Scott v. Acting Albuquerque Area Director*, 29 IBIA

11

61, 1996 WL 69335 (February 7, 1996)("Superintendent's approval of appellants' lease was invalid for failure to comply with NEPA"). Therefore, Devon does not have any authority to access Ms. Donelson's property. Accordingly, Donelson will likely prevail on the merits.

### C. The Harm To Devon Is Slight Compared To Harm to Donelson

The rationale behind NEPA is to ensure that there is no adverse environmental impact due to the proposed activity. Because an EIS was not prepared in this instance, there is no way to determine whether Devon's proposed wells will cause significant harm to the environment. Devon contends that it will suffer harm due to financial losses. However, "[t]he balance of harms will usually favor the issuance of an injunction to protect the environment." *See Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable."); *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.,* 75 F.3d 1429, 1440 (10th Cir.1996) ("An environmental injury usually is of an enduring or permanent nature, seldom remedied by money damages and generally considered irreparable."). Thus, the potential harm to Ms. Donelson's property far outweighs any potential monetary loss to Devon.

### D. Public Has Interest In Protecting Environment and Requiring Governmental Agencies To Follow The Law.

It is a matter of public importance that the environment be protected. In fact, the passage of NEPA proves the public's interest in protecting the environment. NEPA's intent is to "focus[ ] the agency's attention on the environmental consequences of a proposed project," to "guarantee[ ] that the relevant information will be made available to the larger audience that may also play a role" in forming and implementing the agency's decision, and to provide other governmental bodies that may be affected with "adequate notice of the expected consequences and the

opportunity to plan and implement corrective measures in a timely manner." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349–50, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "The thrust of [NEPA] is ... that environmental concerns be integrated into the very process of agency decision-making." *Andrus v. Sierra Club,* 442 U.S. 347, 350, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979).

Furthermore, it is self-evident that the public has an interest in ensuring the government follows its laws. By passing NEPA, Congress determined that protection of the environment is important to the people of the United States. Accordingly, the public has an interest in requiring federal agencies to follow NEPA when it conducts major federal activities.

## II.     THE INJUNCTION SHOULD ISSUE WITHOUT BOND.

Rule 65(c) requires the party seeking a preliminary injunction to give security "in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). "Under this rule the trial judge has wide discretion in the manner of requiring security." *Cont'l Oil Co. v. Frontier Ref. Co .,* 338 F.2d 780, 782 (10th Cir.1964).

This Court has on other occasions granted injunctions without setting bond. See *Oklahoma v. Hobia*, 2012 WL 2995044 (July 31, 2012); *Crowe & Dunlevy, P.C. v. Stidham*, 609 F.Supp.2d 1211 (N.D. Okla. 2009). Requiring a bond in this instance will render the relief unattainable, as it is presumed that Devon will claim that it will suffer significant financial losses if the injunction is granted. However, because NEPA was not followed and irreparable harm will result if Devon proceeds with drilling, it would be unjust to require a significant bond that would render the relief a nullity. Therefore, Donelson requests that this Court grant the Preliminary Injunction without requiring a bond or set it for a nominal amount.

## **CONCLUSION**

For all the foregoing reasons, Martha Donelson respectfully requests that this Court grant her the preliminary injunctive relief herein sought. Donelson seeks entry of a Temporary Restraining Order to keep the status quo until the hearing on the Preliminary Injunction. Donelson requests that this Court set a hearing on the Preliminary Injunction. Donelson requests that the Court set the hearing after June 19, 2014, due to scheduling issues of counsel for Donelson. Counsel has communicated this scheduling issue to counsel for Devon.

                Respectfully submitted,

                */s/Donald A. Lepp*_____
                Gentner F. Drummond, OBA #16645
                Donald A. Lepp, OBA #16260
                The Drummond Law Firm
                1500 South Utica, Suite 400
                Tulsa, OK  74104-6522
                (918) 749-7378

                Attorneys for Plaintiff